United States District Court
Southern District of Texas
**ENTERED**
September 28, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| SEVERIANO GUTIERREZ JR., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:19-CV-191 |
| | § | |
| WADE PENNINGTON & SONS, LLC; | § | |
| dba WADE PENNINGTON & SONS | § | |
| FARM AND RANCH; dba PENNINGTON | § | |
| & SONS MELON SHED, *et al*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND SPECIFIC DAMAGE AWARDS

### FINDINGS OF FACT

1.     Plaintiffs are nine migrant agricultural workers who primarily reside in the Rio Grande Valley of Texas (Valley).[1] During the planting and harvest seasons each year, Plaintiffs leave their homes in the Valley and travel to work in agriculture. As is customary in the industry, Plaintiffs usually find employment through farm labor contractors ("FLCs"), who are hired by the owners of agricultural establishments to recruit, transport, provide housing for, supervise, and pay migrant workers.

2.     Defendant Amanda Segura began working as an FLC in the 1990s and continued for nearly 30 years, purportedly retiring after the events giving rise to this suit.[2] Before she first obtained her FLC license, Segura worked with her husband, who was an FLC whose

---

[1] ECF No. 6 at 4.1.

[2] ECF No. 40, Exhibit B at 9 ¶ 24 to 10 ¶ 25 (deposition of Amanda Segura). All exhibits cited in this document use the exhibit lettering from ECF No. 40.

license was later revoked by the U.S. Department of Labor (USDOL).[3] Segura has extensive knowledge of the laws protecting migrant farmworkers and the strict legal requirements that apply to FLCs, including the mandates of the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 28 U.S.C. § 1801 *et seq*., which provides numerous and important legal protections for migrant farmworkers. Over the course of her career as an FLC, Segura attended annual trainings put on by the USDOL on the legal requirements applicable to FLCs under the AWPA and other federal laws.[4]

3.      Despite her knowledge of the law, Segura had a history of run-ins with the USDOL for violating the laws protecting migrant farmworkers. In 1992, the USDOL found that Segura pocketed tax money, which she deducted from workers' paychecks and failed to forward those monies to the IRS.[5] In 2009, the USDOL again found Segura violated multiple provisions of the laws protecting migrant farmworkers, including that she failed to: (a) keep accurate records; (b) give workers required disclosures about their working conditions; (c) post required posters/notices advising workers of their rights; and (d) give workers complete and accurate pay records.[6]

4.      When fined, Segura agreed that she understood those actions were illegal and promised to comply with the AWPA in the future.[7] Based on those promises, Segura continued to be licensed to recruit (and then employ) migrant and seasonal agricultural

---

[3] Exhibit M at 14.

[4] Exhibit B at 13–15.

[5] Exhibit C at 2.

[6] Exhibit C at 17–22.

[7] Exhibit C at 22.

workers (including the Plaintiffs) for at least seven more years. Notably, Segura admits that her FLC license did not authorize her to house workers, even though she knew that the housing rules did apply to her.[8]

5.      In 2016, Segura worked as an FLC for Wade Pennington & Sons, LLC, a watermelon grower based near Grapeland, in northeast Texas. As an FLC for Pennington & Sons, Segura recruited migrant farmworkers from the Valley to travel to Grapeland and work for Segura and the Penningtons in the watermelon harvest.[9] As is customary in the industry, Segura negotiated with the Penningtons for housing that would be provided to the workers, since they would be too far from their homes to commute daily.[10] The Penningtons offered up a deer hunting cabin owned by Glynn and Troy Pennington, two of the three Pennington brothers who operate Pennington & Sons.[11]

6.      Segura then began recruiting workers, including the Plaintiffs, promising them a "good season of work" in the Penningtons' watermelon fields as well as free housing during their employment.[12] Segura did not provide written disclosures of the job terms to any of the workers.[13] In addition, a later USDOL investigation of Segura pertaining to the

---

[8] Exhibit B at 35 ¶¶ 22–24, 45 ¶¶ 7–10.

[9] The Court takes judicial notice that the seat of Hidalgo County, Texas, is McAllen, Texas, which is approximately 475 miles from Grapeland, Texas.

[10] Exhibit B at 67 ¶¶ 1–18.

[11] The Plaintiffs settled and therefore dismissed their claims against Wade Pennington & Sons, LLC, as well as against Troy and Glynn Pennington individually.

[12] Exhibit B at 75 ¶¶ 3–15.

[13] Exhibit M at 15; Exhibit B at 120 ¶¶ 19–24.

2016 watermelon harvest season with the Penningtons found that the oral disclosures Segura provided (when they were provided) were false and misleading.[14]

7.      In early June of 2016, Segura and her husband traveled to Grapeland from the Valley to inspect the housing and to prepare it for the workers before they arrived.[15] As someone with decades of experience as an FLC, Segura was surprised by the poor condition of the housing, later admitting that the housing "wasn't livable" when she arrived.[16] On Segura's arrival, there was trash scattered around the housing, holes in the wall and the ceiling, the windows were broken, and the refrigerator was not working.[17] Even though Segura knew that she had workers headed up to Grapeland from the Valley, Segura did not alert the workers that the housing was unlivable.[18]

8.      Segura did not ensure that the housing that she provided to the Plaintiffs was inspected and licensed by the appropriate authorities.[19]

9.      Segura did not post the terms and conditions of occupancy at the housing.[20]

10.     Plaintiff Abel Becerra was the first worker to arrive at the housing. After having driven hundreds of miles from his home (at his expense), Becerra had little choice but to stay at the housing once he arrived, despite its disrepair. Segura paid Becerra to perform

---

[14] Exhibit M at 15.

[15] Exhibit B at 68 ¶ 18 to 69 ¶ 21.

[16] Id.

[17] Exhibit B at 80 ¶ 4 to 86 ¶ 19.

[18] Exhibit B at 91 ¶¶ 21–23; Exhibit M at 15.

[19] Exhibit B at 45 ¶¶ 15–23; Exhibit M at 18.

[20] Exhibit B at 52 ¶ 22 to 53 ¶ 3; Exhibit M at 18.

some minimal repairs on the housing. However, her limited requests meant that the bulk of the repairs needed were left undone.[21]

11.     Absent alternative employment or housing, Becerra stayed in the housing and continued working for Segura until approximately July 30, 2016.[22]

12.     The housing that Segura provided to the workers was in poor condition even after the minimal repairs that she paid Becerra to perform. In particular:

    a.  The ceiling in the living room area, which was used as a bedroom, was not fully intact. Photos show areas which were in danger of caving in.[23] Likewise, the ceiling in the upstairs bedroom to the right of the stairs also had a hole in the ceiling.[24] There was also a hole in the ceiling of the kitchen area.[25] Because of these holes, the housing leaked when it rained, and it failed to protect the workers from the elements.[26]

    b.  Inadequate bedding: Because of the number of workers at the housing, workers were often required to share beds.[27] Segura provided the workers with leaky air

---

[21] Exhibit D.

[22] Exhibit D at ¶ 39; *see also* Exhibit E (timecards for the working Plaintiffs produced by Ms. Segura).

[23] Exhibit A at 3–6.

[24] Exhibit A at 12.

[25] Exhibit A at 14; Exhibit D ¶¶ 24–25.

[26] Exhibit D ¶¶ 24–30.

[27] Exhibit D ¶ 20.

mattresses which were uncomfortable.[28] Bedding was not raised off the ground.[29]

    c.   Lack of first aid equipment: The housing did not have a first aid kit.[30]

    d.   Unsafe electrical wiring: Wiring in the kitchen included exposed live electrical wiring.[31]

    e.   No screening on windows and doors: Many of the windows lacked screens.[32]

13.    Plaintiffs Jose Gamboa and Refugio Cepeda Ozuna also worked for Segura at the Penningtons' farm during the 2016 season. Gamboa stayed in the housing from approximately July 19th through July 30th.[33] Cepeda Ozuna stayed in the housing from approximately July 26th through July 31st.[34]

14.    Segura also failed to follow basic health and safety rules at the worksite. Segura admits that neither she nor the Penningtons provided the workers with restroom facilities or handwashing stations in the fields.[35]

15.    In addition to the working Plaintiffs, there were also six Plaintiffs who resigned rather than live in the substandard housing conditions offered by Segura. In late June of 2016, Plaintiffs Severiano Gutierrez, Jr., Dagoberto Lopez, Daniel Lopez, Rafael Lopez,

---

[28] Exhibit D ¶ 19.

[29] 10 Tex. Admin. Code § 90.2(f)(3). Exhibit A at 24–29; Exhibit D ¶ 17.

[30] Exhibit B at 111 ¶¶ 8–9.

[31] Exhibit A at 1.

[32] Exhibit A at 1, 2, 8, 11–13; Exhibit D ¶ 31.

[33] Exhibit E.

[34] Exhibit E.

[35] Exhibit B at 172 ¶ 16 to 173 ¶ 11; Exhibit D ¶¶ 40–41.

Oscar Gutierrez, and Hugo Martinez (hereinafter "the Gutierrez crew" or "the nonworking Plaintiffs") traveled from their homes in the Valley to Grapeland, Texas, after being offered a job by Segura to work for them in the watermelon harvest at the Penningtons' farm.[36] Plaintiffs are experienced migrant farmworkers, who have lived in a variety of temporary, agricultural housing over the history of their careers in agriculture. They chose to work for Segura and the Penningtons, as opposed to other agricultural employers during the 2016 watermelon season, in part due to the promise of "good housing."[37]

16. Upon arriving at the housing, the Gutierrez crew were so shocked at the poor condition of the housing that, despite their numerous hours of travel and related expenses they incurred, they refused to stay there.[38] Given the terrible housing conditions, the nonworking Plaintiffs determined that the housing was unlivable and returned to their homes in the Valley.[39]

17. After the 2016 watermelon season was over, the USDOL investigated Segura and the Penningtons. Pursuant to that investigation, the USDOL determined that Segura had violated the AWPA by, *inter alia*:

   a. Failing to disclose the terms and conditions of the jobs to the workers she recruited;

---

[36] Exhibit F ¶¶ 4–9; Exhibit G ¶¶ 4–9.

[37] Exhibit F ¶ 8; Exhibit G ¶ 8.

[38] Exhibit F ¶¶ 10–15; Exhibit G ¶¶ 10–15.

[39] Exhibit B at 135 ¶ 21 to 136 ¶ 3; Exhibit F ¶ 15; Exhibit G ¶ 15.

   b.  Failing to provide workers with the terms and conditions of occupancy of the

       housing;

   c.  Failing to ensure the housing met applicable health and safety guidelines; and

   d.  Providing housing to workers without an FLC license that authorized her to do

       so.[40]

18.    As a result of its investigation, the USDOL assessed $31,759.00 in civil monetary

penalties against Segura for her violations of the AWPA.[41]

## CONCLUSIONS OF LAW

### A.    Introduction

19.    The AWPA creates a formalized structure for often transient employment

relationships in agriculture, defining employment relationships between farm-owners and

agricultural associations (called "agricultural employers" in the AWPA), FLCs, and both

migrant and seasonal agricultural workers. FLCs must follow the worker protections

mandated by the AWPA, *inter alia*, ensuring that migrant workers receive accurate, written

disclosures about their future work to abiding by the "working arrangement" described in

those disclosures to ensuring that housing is suitable when provided to agricultural

workers.[42] A private right of action may be brought by "[a]ny person aggrieved by" a

violation of the AWPA.[43]

---

[40] Exhibit M at 14–20.

[41] Exhibit M at 20.

[42] 29 U.S.C. §§ 1821–23.

[43] 29 U.S.C. § 1854(a).

20.     Segura was an FLC as defined by the AWPA. An individual is an FLC if, in exchange for money, they recruit, solicit, hire, employ, furnish, or transport any migrant or seasonal agricultural workers.[44] Segura admits that she was an FLC and that she maintained a license as an FLC for almost 30 years.[45] In the 2016 watermelon season, Segura admits that she recruited, hired, and employed the Plaintiffs, and that she furnished them as a crew to the Penningtons' farm.[46]

21.     Likewise, the Plaintiffs were migrant agricultural workers protected by the AWPA. Under the AWPA, a migrant agricultural worker is someone who (a) is employed in seasonal or temporary agricultural work, and (b) is required to be absent overnight from their permanent place of residence. The work that Segura and the Penningtons offered to the Plaintiffs was seasonal or temporary agricultural work in nature—Segura estimated that the watermelon harvest season would take six to eight weeks.[47] Likewise, the Plaintiffs were required to be absent overnight from their permanent residences in the Valley—which was at least a seven- to eight-hour drive to the Penningtons' farm in Grapeland; plainly too far for a daily commute.[48]

22.     Finally, both the working and nonworking Plaintiffs are "person[s] aggrieved by a violation" of the AWPA and thus able to bring a private right of action.[49] "Because the

---

[44] 29 U.S.C. § 1802(6)–(7).

[45] Exhibit B at 9 ¶ 24 to 10 ¶ 25.

[46] Exhibit B at 75 ¶¶ 3–15.

[47] Exhibit B at 25 ¶ 22 to 26 ¶ 2.

[48] *See supra* note 8. A Google Maps search indicates that the drive from McAllen, Texas to Grapeland, Texas takes 7 hours 28 minutes.

[49] 29 U.S.C. § 1854(a).

AWPA is a remedial statute and its standing provision is patterned after Civil Rights statutes, the Act must be construed broadly to effect its humanitarian purpose."[50] Congress' decision to explicitly broaden the language in the liability section of the Act from "migrant/seasonal agricultural worker" to "person aggrieved" indicates a clear intent to allow nonworking parties to bring suits under the AWPA so long as they are aggrieved by what are otherwise violations of the Act.[51] The overwhelming weight of precedent under the AWPA is that an individual may bring a claim even if they are not themselves a migrant or seasonal agricultural worker under the AWPA.[52] The relevant inquiry is not whether the defendant ultimately employed the plaintiff in agricultural work, but whether the defendant was an agricultural employer or FLC who violated the Act, including its recruitment and pre-arrival transportation standards, and whether the plaintiff was "aggrieved" by those actions.[53] Since Segura was an FLC and all the Plaintiffs were aggrieved by her violations of the AWPA, each Plaintiff may bring these claims, even though the Gutierrez crew did not perform any work for Segura due to their constructive termination as a result of the deplorable housing conditions.

---

[50] *Hernandez v. Ruiz*, 812 F. Supp. 734, 735 (S.D. Tex. 1993).

[51] *Id.*; *cf.* 29 U.S.C. § 1855(a) (Retaliation/discrimination claims under AWPA may be brought by "any migrant or seasonal agricultural worker.").

[52] *Hernandez*, 812 F. Supp. at 735 (nonworking family members who stayed in housing could bring lawsuits under AWPA); *Sanchez v. Overmyer*, 891 F. Supp. 1253, 1258 (N.D. Ohio 1995) (same; also holding that plaintiffs could bring suit against housing provider for housing violations during period after their employment ended); *Cornejo-Ramirez v. James G. Garcia, Inc.*, No. 99-0201, 2000 WL 33350974, at *7 (D. Ariz. 2000) (holding plaintiffs were "persons aggrieved" by AWPA violation even before their employment for defendants began); *Deck v. Peter Romein's Sons, Inc.*, 109 F.3d 383, 390–92 (7th Cir. 1997) (holding that any person aggrieved by an agricultural employer's violation of transportation regulations may bring suit) ("[W]hether an agricultural employer was an aggrieved person's employer is immaterial for purposes of determining whether the Act provides for a cause of action by the aggrieved person against that agricultural employer.").

[53] *Deck*, 109 F.3d at 391.

10

**B.      Segura was not properly registered as an FLC under the AWPA.**

23.      The AWPA requires that a person who engages in FLC activity obtain and maintain

an FLC license that specifies which FLC activities that person is authorized to perform,

including providing housing to workers.[54] As Segura admits, her FLC license did not

authorize her to house workers, even though she knew that the housing rules applied to

her.[55] Thus, as an FLC providing housing to workers, Segura violated 29 U.S.C. § 1811(a)

of the AWPA by failing to register the housing.

**C.      Segura failed to provide the workers with written disclosures of the terms and conditions of their working and housing conditions as required by the AWPA.**

24.      The AWPA requires that any FLC who recruits migrant agricultural workers "shall

ascertain and disclose in writing to each such worker" several material conditions of the

employment, including, *inter alia*, the place of employment, the wage rates to be paid, the

period of employment, and the housing to be provided.[56] Segura admits that during the

2016 watermelons season with the Penningtons, she failed to provide written disclosures

to any of the workers.[57] Thus, Segura failed to provide the required disclosures and violated

29 U.S.C. § 1821(a).

---

[54] 29 U.S.C. §§ 1802(6), 1811(a); *see also* 29 C.F.R. § 500.45.

[55] Exhibit B at 35 ¶¶ 22–24, 45 ¶¶ 7–10.

[56] 29 U.S.C. § 1821(a).

[57] Exhibit M at 15; Exhibit B at 120 ¶¶ 19–24.

**D.** **Segura violated the working Plaintiffs' AWPA "working arrangement" without justification by failing to provide the Plaintiffs with field sanitation.**

25.     The "working arrangement" is not limited merely to the terms in the written disclosures. Rather, it is established that the AWPA "working arrangement" includes an implied promise by the employer or FLC to comply with applicable state and federal worker protections, including the field sanitation standards under the Occupational Safety and Health Act (OSHA).[58] The OSHA field sanitation regulations are clear that FLCs must ensure that workers are provided with handwashing facilities and toilets in the fields.[59] Segura admits that the workers were not provided with toilets or handwashing stations.[60] Therefore, Segura violated the terms of the working arrangement with the working Plaintiffs' by failing to meet the OSHA standards under 29 C.F.R. § 1928.110.7.

**E.** **Segura failed to post the terms and conditions of the occupancy of the housing.**

26.     The AWPA requires that FLCs who provide housing must "post in a conspicuous place or present to such worker a statement of the terms and conditions, if any, of occupancy of such housing."[61] Segura admits that she failed to do so.[62] The USDOL investigation also found that Segura failed to make the required posting at the housing

---

[58] *Elizondo v. Podgorniak*, 100 F. Supp. 2d 459, 463 (E.D. Mich. 2000); *De La Cruz v. Gill Corn Farms, Inc.*, No. 03-cv-1133, 2005 WL 5419057, at *7 (N.D.N.Y. 2005); *Montalvo v. Larchmont Farms*, No. 06-2704, 2009 WL 4573270, at *12 (D.N.J. 2009).

[59] 29 C.F.R. § 1928.110. Confusingly, the OSHA regulation only applies to "agricultural employers" and not explicitly to FLCs. 29 C.F.R. § 1928.110(b). However, the OSHA's definition of "agricultural employer" is broader than the definition in the AWPA, and it includes any person who "recruits and supervises" agricultural workers. *Id.* Segura supervised the workers in the fields, so she is an agricultural employer for the purpose of OSHA. Exhibit M at 11; Exhibit D at 39.

[60] Exhibit B at 172 ¶ 16 to 173 ¶ 11.

[61] 29 U.S.C. § 1821(c).

[62] Exhibit B at 52 ¶ 22 to 53 ¶ 3.

site.[63] Therefore, Segura violated 29 U.S.C. § 1821(c) by failing to make the required postings.

**F.      Segura failed to obtain a federal and state inspection of the housing and failed to post a certificate of occupancy at the housing site.**

27.     The AWPA requires that all housing provided to migrant farmworkers must be inspected prior to occupancy by the appropriate state and/or federal agencies and must be certified to comply with all applicable health and safety standards.[64] If the housing passes the preoccupancy inspection, the housing provider must then take the certificate of occupancy they receive from the inspecting agency and post that certificate of occupancy at the housing site.[65] It is the responsibility of every "person who owns or controls the housing" to ensure that the housing is not occupied "unless a copy of the certification is posted at the site."[66]

28.     Segura had sufficient control of the housing to be subject to the AWPA's broad remedial mandate. A person "controls" housing for the purposes of the AWPA if that person is "in charge of or has the power or authority to oversee, manage, superintend, or administer the housing facility . . . either personally or through an authorized agent or employee, irrespective of whether compensation is paid for engaging in any of the previously mentioned capacities." Congress intended that the term "control" be interpreted "with the broadest possible meaning to ensure that the person who owns or controls the

---

[63] Exhibit M at 18.

[64] 29 U.S.C. § 1823(b)(1).

[65] *Id.*

[66] *Id.*

facility used as housing . . . is responsible for maintaining that facility."[67] An FLC or employee of an agricultural employer or an owner of housing may "control" the housing if they are delegated control over the housing as part of their employment or contract with the owner of the housing.[68]

29.     Segura admits that it was her idea for the Penningtons to provide housing to her crew (as they could not otherwise labor for her, or the farm, given the distance), and she negotiated with the Penningtons to secure that housing.[69] She used the promise of free housing to recruit her crew of workers from the Valley.[70] When she arrived at the housing and found that it was in deplorable condition, she took personal responsibility for locating beds, refrigerators, air conditioners, and other necessities.[71] She personally paid Abel Becerra to repair portions of the housing and provided materials for him to do so.[72] Thus, while her actions were legally inadequate for the purposes of fulfilling the habitability requirements in the AWPA for housing conditions, Segura clearly "controlled" the housing as contemplated by the AWPA and was covered by the law. Like the grower's employee in *Perez*, Segura openly demonstrated she was delegated the "authority to prepare the property for the workers and to make repairs once the workers arrived."[73]

---

[67] *Perez v. Howes*, 7 F. Supp. 3d 715, 728 (W.D. Mich. 2014) (quoting H.R. Rep. No. 97–885, at 17–18 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 4547, 4563).

[68] *E.g.*, *id.*

[69] Exhibit B at 67 ¶¶ 1–18.

[70] Exhibit D ¶ 6; Exhibit F ¶ 8; Exhibit G ¶ 8; Exhibit M at 6.

[71] Exhibit M at 5; Exhibit B at 105 ¶ 9 to 106 ¶ 1.

[72] Exhibit B at 93 ¶ 22 to 97 ¶ 10; Exhibit D ¶¶ 9–11.

[73] *Perez*, 7 F. Supp. 3d at 728.

14

30.     In Texas, housing must be inspected and licensed by the Texas Department of Housing and Community Affairs (TDHCA) prior to occupancy.[74] The TDHCA has promulgated state standards for farmworker housing which it has the authority to enforce.[75] These standards apply in addition to the federal standards imposed by the AWPA and other federal statutes and regulations.[76] Under federal law, housing constructed before April 1, 1980, must comply with the USDOL Employment and Training Administration (ETA) standards.[77] The property at which the Plaintiffs were housed was constructed before 1980, so the ETA standards apply.[78]

31.     Segura admits that she failed to have the housing she provided to the Plaintiffs inspected and licensed.[79] The USDOL investigation likewise concluded that Segura never obtained the required inspection and licensure.[80]

32.     Therefore, Segura violated Plaintiffs' rights under 29 U.S.C. § 1823(b) by failing to obtain an inspection or license for the housing she provided to the Plaintiffs.

---

[74] Tex. Gov't Code § 2306.921 *et seq.*

[75] *See* 10 Tex. Admin. Code § 90. In February of 2020, the TDHCA amended the regulations at 10 Texas Administrative Code § 90.1 *et seq.* 45 Tex. Reg. 751. For the sake of simplicity, the cites in this brief will refer to the provisions of the Code as they existed prior to the 2020 revisions—since the law applicable to the time period of Plaintiffs' claims is that as written in 2016; the 2020 revisions are not retroactive.

[76] 29 U.S.C. § 1871.

[77] 29 C.F.R. § 500.132.

[78] See Exhibit J (Declaration of Dave Mauch); Exhibit K (Houston County Appraisal District records).

[79] Exhibit B at 45 ¶¶ 15–23

[80] Exhibit M at 18

**G.     Segura failed to provide housing that complied with state and federal health and safety regulations.**

33.     In addition to securing an inspection and a certificate of occupancy, it is also incumbent on each person, who owns or controls migrant farmworker housing per the AWPA, to ensure that the housing complies "with substantive Federal and State safety and health standards applicable to that housing."[81] As discussed above, the applicable state standards are the TDHCA housing standards, and the applicable federal standards are the USDOL ETA standards.[82]

**H.     The housing Segura provided to her crew was structurally unsound and did not protect the workers from the elements.**

34.     Both the ETA standards and the TDHCA standards require that the housing be structurally sound, in good repair, and protect the workers from the elements.[83] The housing provided to the workers was not in good repair and did not protect them from the elements. The ceiling in the living room area, which was used as a bedroom, was not fully intact.[84] While the workers were there, the hole in the ceiling leaked despite workers' attempts, with Segura's paid encouragement, to repair it.[85] Likewise, the ceiling in the kitchen area and in the upstairs bedroom to the right of the stairs had large holes.[86] Because the housing leaked when it rained, it failed to protect the workers from the elements. Thus, the housing failed

---

[81] 29 U.S.C. § 1823(a).

[82] See Tex. Gov't Code § 2306.921 *et seq.*; substantive standards at 10 Tex. Admin. Code § 90; *see also* 29 C.F.R. § 500.132; substantive standards at 20 C.F.R. § 654.404 *et seq.*

[83] 20 C.F.R. § 654.407(a); 10 Tex. Admin. Code § 90.2(d)(1).

[84] Exhibit A at 3–6.

[85] Exhibit B at 161 ¶ 23 to 163 ¶ 4; Exhibit D ¶¶ 26–30.

[86] Exhibit A at 12, 14; Exhibit D ¶¶ 24–25.

to meet the standards set forth at 20 C.F.R. § 654.407(a) and 10 Texas Administrative Code § 90.2(d)(1).

### i. *The housing did not have adequate beds in good repair for the workers to sleep on.*

35.     Both state and federal standards lay out a series of requirements for bedding.[87] As discussed below, the housing Segura provided to the Plaintiffs failed to meet these requirements.

36.     First, Segura violated the ETA regulations by forcing unrelated workers to share beds. The ETA regulations require that beds used for double occupancy may be provided only in family accommodations.[88] However, due to the excessive number of workers at the housing, workers (who were not "family" as defined by the regulations) were often required to share beds.[89]

37.     Second, the bedding quality also failed to meet the ETA and state standards. The state standards require beds to be "in good repair", whereas the ETA regulations require

---

[87] 20 C.F.R. § 654.416; 10 Tex. Admin. Code § 90.2(f).

[88] 20 C.F.R. § 654.416(e); per 20 C.F.R. § 675.300, the definition of "family" is as follows:
>      Family means two or more persons related by blood, marriage, or decree of court, who are living in a single residence, and are included in one or more of the following categories:
>      (1)     A married couple and dependent children;
>      (2)     A parent or guardian and dependent children; or
>      (3)     A married couple.
>      Requiring workers who are not "family" to share a mattress (or otherwise face the choice of sleeping on the floor for the course of their employment) is understandably, unlivable, and violates the Act.

20 C.F.R. § 675.300.

[89] Exhibit D ¶ 20.

that mattresses be "comfortable."[90] Segura provided the workers with leaky air mattresses which were uncomfortable.[91]

38.    Third, Segura also failed to provide bedding which met the state requirement that bedding be raised off the ground.[92]

### ii.    The housing did not have functioning first aid facilities.

39.    The housing failed to meet both the ETA and state regulations regarding first aid. The state regulations and the federal regulations require that the housing have a first aid kit.[93] Segura admits that the housing did not have a first aid kit.[94]

### iii.    The housing did not have safe electrical wiring.

40.    The housing failed to meet both state and ETA regulations which require safe electrical wiring.[95] In particular, the wiring in the kitchen included exposed live electrical wiring.[96] In addition to being obviously unsafe, this is a violation of the National Electric Code regulations incorporated into the state regulations.[97]

---

[90] 10 Tex. Admin. Code § 90.2(f)(1); 20 C.F.R. § 654.416(a).

[91] Exhibit D ¶ 19.

[92] 10 Tex. Admin. Code § 90.2(f)(3); Exhibit A at 24–29; Exhibit D ¶ 17.

[93] 10 Tex. Admin. Code § 90.2(n)(6); 20 C.F.R. § 654.417(g).

[94] Exhibit B at 111 ¶¶ 8–9.

[95] 20 C.F.R. § 654.410(d); 10 Tex. Admin. Code § 90.2(k)(4).

[96] Exhibit A at 1.

[97] *See* Nat'l Elec. Code § 110.27. Live parts of electrical equipment operating at 50+ volts shall be guarded against accidental contact by approved enclosures. *Id.* The standard voltage level for home power in the US is 120 volts. *Electricity 101*, Off. of Energy, https://www.energy.gov/oe/information-center/educational-resources/electricity-101 (last visited Sept. 27, 2021).

#### iv.   *The housing did not have window screens as required by law.*

41.    Both the ETA and state regulations require that all windows which open to the outside have tight-fitting screens.[98] Many of the windows lacked screens.[99]

## SPECIFIC DAMAGE AWARDS

42.    Plaintiffs bringing AWPA claims may seek the greater of either (a) their actual damages or (b) statutory damages of up to $500 per worker per violation of the AWPA.[100] In this case, Plaintiffs seek statutory damages for each violation of the AWPA except for the substantive housing violations under 29 U.S.C. § 1823(a).

43.    For the violations of the housing safety and health standards under § 1823(a), Plaintiffs seek actual damages. Plaintiffs requested in their Motion for Partial Summary Judgment that the Court allow supplemental briefing on the issue of actual damages.[101] After granting summary judgment as to liability, a court may allow additional briefing from the parties on actual damages.[102]

44.    On the remainder of their claims, Plaintiffs have requested a maximum statutory damage award of $500 per Plaintiff per violation.[103] When evaluating the range of statutory damages, courts look to several factors, including: (1) the nature and persistence of the

---

[98] 10 Tex. Admin. Code § 90.2(l); 20 C.F.R. § 654.408.

[99] Exhibit A at 1, 2, 8, 11–13; Exhibit D ¶ 31.

[100] 29 U.S.C. § 1854(c)(1).

[101] ECF No. 40, p. 31.

[102] *See, e.g.*, Order at 8, *Dorado v. Villanueva*, No. 1:12-CV-00134 (S.D. Tex. Mar. 4, 2015), ECF No. 50 (granting default judgment on liability for AWPA claims while allowing plaintiffs an additional fourteen days to brief the court on remaining claims).

[103] ECF No. 40, p. 32.

violations—including whether the violations are substantive or technical; (2) the extent of the defendant's culpability; (3) damage awards in similar cases; (4) the defendant's ability to prevent future violations of the AWPA; and (5) the circumstances of each case.[104]

45.    When courts make damages determinations, and while applying those factors, inflation is a relevant consideration. The $500 maximum award for violations of the AWPA was set on the Act's passage in 1983 and has not been adjusted in the subsequent 38 years, during which the value of the dollar has inflated by 163.4%.[105] Thus, a $500 damage award today is the equivalent of an award of approximately $187 on the Act's passage, less than half of the total maximum available damages. Other courts have taken inflation into account when assessing AWPA statutory damages.[106]

## A.  Housing-related violations

46.    Plaintiffs seek statutory damages for housing violations under:

- 29 U.S.C. § 1811(a) for Segura's failure to obtain an FLC license to house workers; and

- 29 U.S.C. § 1823(b)(1) for Segura's failure to obtain the required preoccupancy inspection, to post the certificate of inspection, and to post the terms and conditions of occupancy at the housing.

---

[104] *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1332 (5th Cir. 1985).

[105] *See CPI Inflation Calculator*, U.S. Bureau of Labor Stat., https://www.bls.gov/data/inflation_calculator.htm (last visited Sept. 27, 2021) (citing USDOL Bureau of Labor Statistics data).

[106] *See Castillo v. Case Farms of Ohio*, 96 F. Supp. 2d 578 (W.D. Tex. 1999); *Fanette v. Steven Davis Farms, LLC*, No. 1:10-cv-136, 2014 WL 2961239 (N.D. Fla. 2014); *Herrera v. Singh*, 103 F. Supp. 2d 1244 (E.D. Wash. 2000).

### i.   *The housing violations were severe and persistent.*

47.    As to the first factor—whether the violations are severe and persistent, or merely technical—these violations are clearly substantive. The housing regulations in the AWPA protect the basic human dignity of workers. The registration requirement in 1811(a) is a crucial part of the AWPA's regulatory scheme, not merely a bureaucratic box to be checked, preoccupancy, with no consequence or concern for the actual conditions provided once the habitants arrive.

48.    The FLC licensure requirement ensures that FLCs, who are often smaller in size and less legally sophisticated than the growers they work for, have an opportunity to understand the law and how to comply with it, including interacting with the licensing agencies for any questions or concerns they may have. Licensed FLCs, like Segura, are required to submit a variety of information to the USDOL if they further wish to house, transport or drive workers, for the purpose of ensuring that there is appropriate pre-inspection and oversight. As discussed above, this includes disclosing the location of the housing to be used, for preoccupancy inspection, as well as a requirement that the FLC update the USDOL if they use additional housing or make modifications thereto. This is crucial to the enforcement of the AWPA's mandate. If the USDOL had known about the housing to be used in this case, it could have done an inspection before the season to ensure the housing complied—or (most likely) prohibited it from being offered or used at all, given the structural deficiencies evidenced here.

49.     Segura agrees that the housing rules are important to protect the health, safety, and dignity of workers.[107] Segura agreed that on her arrival, the housing "wasn't livable."[108] While Segura opines that the housing was made habitable by the time she left, the video walkthrough details the inexcusable conditions of the housing at the end of the workers' occupancy and establishes beyond any genuine dispute the "deplorable" condition of the housing.[109] Segura does not disagree that the photos accurately depict the state of the housing at the time the workers stayed there.[110]

50.     Poor housing conditions are severe violations of the AWPA. "Unsanitary conditions . . . can . . . lead to worse health and safety problems, such as mice and other rodents."[111] Workers should not be required to choose between their health and their ability to earn a living. These health and safety requirements "strike at the heart of the protections envisioned in the AWPA."[112]

### ii.     *Segura is directly culpable for the housing violations.*

51.     There is no question that Segura is directly culpable, both for her failure to obtain the proper FLC license, as well as her failure to ensure that the housing was inspected prior to occupancy. Segura was an FLC for decades with a deep familiarity with the relevant agricultural laws. She attended annual trainings put on by the USDOL for FLCs.[113] She

---

[107] Exhibit B 57 ¶ 14 to 60 ¶ 21; *see generally Howard v. Malcolm*, 658 F. Supp. 423 (E.D.N.C. 1987).

[108] Exhibit B 79 ¶¶ 14–16.

[109] Exhibit A; Exhibit M at 15.

[110] *See generally* Exhibit A.

[111] *Howard*, 658 F. Supp. at 436.

[112] *Id.*

[113] Exhibit B at 13–15.

applied for an FLC license every two years and knew each time she submitted the application that she was required to inform the USDOL whether she would be providing housing.[114] She admits knowing she should have obtained a license to provide housing, even though she made no effort to even attempt to do so.[115]

52.     Segura was also the driving force behind the Penningtons' choice to provide housing, and the Penningtons delegated to her the responsibility to ensure that the housing was in an acceptable condition.[116] Given the distance, housing was essential to ensure that the workforce Segura and the Penningtons needed to run their business would arrive, and stay, to perform the work.

53.     Segura's culpability is also underscored by her having misled the Plaintiffs. Segura admits that she did not warn Abel Becerra that the housing conditions were poor, even though she acknowledges she knew it was not livable.[117] She likewise continued to represent to subsequent workers for the remainder of the season that the housing was livable, even though she knew the housing was in such deplorable condition that the Gutierrez crew refused to stay there.[118]

54.     In this case, Segura was clearly culpable—she convinced the Penningtons the housing was needed; she was responsible for fixing the housing; she had the responsibility to update her FLC license upon providing housing and she continued to recruit workers

---

[114] Exhibit B at 34 ¶ 21 to 35 ¶ 15.

[115] Exhibit B at 44 ¶ 23 to 45 ¶ 10.

[116] Exhibit B at 66 ¶ 19 to 69 ¶ 25.

[117] Exhibit B at 92 ¶¶ 4–12.

[118] Exhibit B at 91 ¶¶ 15–23, 133 ¶ 16 to 134 ¶ 9; Exhibit F ¶ 5; Exhibit G ¶ 5.

even knowing that she violated the law. This factor likewise counsels in favor of a maximum award of $500 in statutory damages, per Plaintiff, to be assessed against Segura.

### iii.   Damage awards in similar cases

55.   Courts have routinely awarded maximum statutory damages for violations of the AWPA's housing provisions.[119]

56.   A $500 award is even more paltry when compared to damages available in other landlord-tenant contexts without damage caps. For example, in instances where a landlord fails to repair a leasehold, the Texas Property Code allows tenants to recover civil penalties of $500, one month's rent, actual damages, attorney's fees, and costs.[120]

## B.  Written disclosure violations

57.   The Court also awards each Plaintiff $500 in statutory damages for Segura's failure to provide them with written disclosures as required by 29 U.S.C. § 1821(a).

### i.   The disclosure violations were severe and persistent.

58.   Far from a merely technical violation, the written disclosures are a lynchpin of the AWPA's statutory enforcement scheme. They define the terms of the "working arrangement" between the employer or FLC and the worker, giving shape and form to the often-ephemeral promises of work given to migrant farmworkers. The disclosures allow

---

[119] *Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1266 (N.D. Fla. 2014) (awarding maximum amount of $500 per worker for housing violations); *Herrera*, 103 F. Supp. 2d at 1250–52 (awarding $500 per worker for violations of housing safety conditions and $100 for failure to post terms and conditions of housing); *Lainez v. Baltazar*, No. 5:11-cv-167, 2013 WL 3288369, at *2 (E.D.N.C. June 28, 2013) (awarding $500 per worker for a failure to provide sanitary living and working conditions). These cases do not award attorneys' fees or costs for AWPA housing claims, because the Act does not allow for them to be recouped.

[120] Tex. Prop. Code § 92.056(a); *e.g.*, *Martin v. Brinkley*, No. 14-033, 2015 WL 4051865, at *2 (Tex. App.—Houston [14th Dist.] July 2, 2015) (upholding trial court's judgment of $4,792 in damages and $12,039.25 in attorneys' fees for landlord's failure to fix plumbing).

for workers to make an informed decision about whether to accept an offer of work that requires them to travel great distances for extended periods of time, and with little resources.

59.     Thus, while the written disclosures may seem like a formality in cases where oral disclosures were given, they are not. The written disclosures are a crucial part of the AWPA's remedial goal to formalize the otherwise informal relationships between migrant laborers and their employers.[121]

60.     In particular, the disclosures require the recruiter to disclose the housing to be provided, if offered to workers (or their families).[122] Had Segura disclosed the housing to be used, the workers could have checked whether the housing was licensed and inspected by the TDHCA.[123] Given the opportunity to see that the housing was not properly licensed or inspected, the workers would have been able to decline the work and seek other employment for the season. Segura agrees that written disclosures are important. She testified in her deposition that written disclosures enable workers to make informed decisions about whether to take a job.[124]

---

[121] *See Martinez v. Shinn*, 992 F.2d 997, 1000 (9th Cir. 1993); *Herrera*, 103 F. Supp. 2d at 1250; *Leach v. Johnston*, 812 F. Supp. 1998, 1211 (M.D. Fla. 1992); *Smith v. Bonds*, No. 91-818, 1993 WL 556781, at *13 (E.D.N.C. Sept. 28, 1993) (one of the AWPA's primary purposes was to "provide agricultural workers with information concerning potential employment so they could make an intelligent and informed judgment about whether to accept employment"); *Villalobos v. Vasquez-Campbell*, No. EP-89-CA-27, 1991 WL 311902, at *3 (W.D. Tex. Nov. 15, 1991); *Bertrand v. Jorden*, 672 F. Supp. 1417, 1425 (M.D. Fla. 1987).

[122] 29 U.S.C. § 1821(a)(5).

[123] The TDHCA maintains an updated list of licensed facilities at https://tdhca.state.tx.us/migranthousing/index.htm.

[124] Exhibit B at 39 ¶ 20 to 40 ¶ 14.

61.     Segura's disclosure violations were also persistent. In 2009, the DOL investigation of Segura's practices also found that she had failed to issue written disclosures to those workers.[125] Segura represented to the DOL in the 2009 investigation that she would provide written disclosures to workers in the future, though she completely failed to do so in this instance.[126] Segura admits that she did not provide a written disclosure to any of the workers in 2016.[127]

### ii.  Segura was directly culpable for the disclosure violations.

62.     Under the AWPA, it was Segura's responsibility to provide the workers with written disclosures. The disclosures must be provided "at the time of the worker's recruitment." 29 U.S.C. § 1821(a). Segura was the individual having the conversations with Plaintiffs and other workers about the terms of the work and the housing.

63.     As discussed above, Segura was a sophisticated FLC with decades of experience and training on the relevant laws. While she testified she could not remember whether the law required written disclosures, it is uncontroverted that Segura was specifically advised of the written disclosure requirement in 2009, when the DOL found she failed to provide written disclosures.[128] Segura then promised the DOL that she would abide by the written disclosure requirement in the future and admits that she broke that promise in at least 2016,

---

[125] Exhibit C at 17.

[126] *Id.* at 18.

[127] Exhibit B at 120 ¶¶ 19–24.

[128] Exhibit C at 18.

when she recruited Plaintiffs and various other workers to work for her and the Penningtons.[129]

### iii. Damage awards in similar cases

64.     As discussed above, the Court considers inflation when reviewing damage awards in similar cases, including older AWPA cases, whenever less than the maximum $500 damage award was applied. For example, in *Martinez v. Shinn*,[130] the court awarded $250 per violation for failure to provide written disclosures. Using an inflation estimator, that would be equivalent to $487.13 in 2021 dollars—nearly the entirety of the $500 statutory maximum allowed.

## C. Field sanitation violations

65.     Finally, the statutory factors likewise counsel in favor of a maximum damage award for the field sanitation violations.

### i. Field sanitation violations are severe and were persistent.

66.     Segura's failure to provide basic sanitation—toilets and handwashing facilities— was severe. Without toilets, workers were left to use the restroom in the fields. Without handwashing facilities, workers were left to rinse their hands with drinking water, as Segura did not provide soap.[131] This is a basic question of human dignity. Segura admits that this was harmful to the health and safety of both the workers and the general public

---

[129] *Id.*; Exhibit B at 190 ¶¶ 20–23.

[130] No. C-89-813, 1991 WL 84473, at *19–20 (E.D. Wash. May 20, 1991), *aff'd by*, 992 F.2d 997 (9th Cir. 1993).

[131] Exhibit B at 173 ¶¶ 8–11.

which consumed the Penningtons' watermelons.[132] Again, health and safety violations "strike at the heart" of what the AWPA seeks to regulate.[133] The violations were also persistent as they lasted the entire season.

### ii.  *Segura is directly culpable for the field sanitation violations.*

67.    Segura was well aware of the requirement that there be toilets and handwashing facilities in the fields.[134] When asked about the toilets and handwashing facilities, Segura testified that the extent of her efforts to resolve the problems were that she asked the Penningtons to provide restrooms: "I told [Mr. Pennington] twice about the restroom and he said that they didn't furnish any restrooms and they never did, never."[135]

68.    The AWPA demands more of Segura than that she merely accept the Pennington's inhumane working conditions in the fields. Given the Penningtons' refusal to remedy the problem, and Segura's awareness of the law regarding field sanitation, it was incumbent on her to fix the problem. As discussed in paragraph 25 above, the OSHA field sanitation standards also applied to Segura, making her culpable for the violations. Segura was not legally permitted to simply accept the Penningtons' refusal to provide toilets. She should have met her duty by providing field sanitation if the Penningtons refused.

---

[132] Exhibit B at 54 ¶ 19 to 55 ¶ 17.

[133] *Howard*, 658 F. Supp. at 436.

[134] Exhibit B at 54 ¶¶ 7–21.

[135] *Id.* at 172 ¶ 25 to 173 ¶ 2.

## CONCLUSIONS

69.     Accordingly, the Court enters judgment against Defendant Segura regarding her liability for the following violations of the AWPA, including the maximum statutory violations available of $500 per person, per violation, where noted:

A.  For all Plaintiffs, liability as to Segura's violation of 29 U.S.C. § 1823(a) for failure to comply with substantive federal and state safety and health standards applicable to housing.

B.  For all Plaintiffs, $500 per violation for the following violations:

   i.    29 U.S.C. § 1811(a) – Failure to register as FLC providing housing;

   ii.   29 U.S.C. § 1821(a) – Failure to provide written disclosures;

   iii.  29 U.S.C. § 1823(b)(1) – Failure to obtain an inspection of the housing and failure to post certificate of occupancy at the housing site; and

   iv.   29 U.S.C. § 1821(c) – Failure to post the terms and conditions of occupancy of the housing.

C.  For the "working Plaintiffs" (Abel Becerra, Jose Gamboa, and Refugio Cepeda Ozuna), $500 per violation for:

   i.    29 U.S.C. § 1822(c) – Violation of the working arrangement by failing to comply with OSHA field sanitation standards.

70.     Thus, the Court awards the working Plaintiffs (Abel Becerra, Jose Gamboa, and Refugio Cepeda Ozuna) $2,500 each in statutory damages.

71.     The Court also awards the nonworking Plaintiffs (Severiano Gutierrez Jr., Dagoberto Lopez, Daniel Lopez, Rafael Lopez, Oscar Gutierrez, and Hugo Martinez) $2,000 each in statutory damages.

72.     Regarding actual damages for Plaintiffs' claims under 29 U.S.C. § 1823(a), the Court ORDERS that Plaintiffs file additional briefing on this subject and a proposed order within 30 days of the date of this Order. The Defendant may file a response to briefing within 30 days after receipt of Plaintiffs' briefing.

ORDERED this 28th day of September, 2021.


_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE